Good morning, Your Honors, and may it please the Court, Damien Schiff for the appellant, Barnum Timber Company. With the Court's indulgence, I'd like to reserve two minutes of my time for rebuttal. Barnum Timber has standing to challenge EPA's listing of Redwood Creek as an impaired water body because Barnum's acknowledged economic injury is fairly traceable to EPA's decision to list Redwood Creek. The general essential standard is... What economic injury is acknowledged? The district court, in its opinion, acknowledged, as well as EPA acknowledged in the district court, that Section 898 of the Forest Practice Rules imposes additional mitigation requirements on Barnum that form an economic injury, and that that is, in fact, a cognizable injury under Article III. Is there any reason why they couldn't enforce those rules without the 303 acceptance of the list? No, Your Honor. The, the... Now, what? Could they, could the State of California enforce the 898 requirements absent inclusion within the EPA's list? No, Your Honor, because Section 898 by its own terms is limited in its application. That is to say, the trigger for Section 898 is, in fact, a listing of a water body under 303d. There is no other manner for Section 898's additional mitigation requirements to apply except if a 303d-listed water body is in the area of the proposed timber harvest. There is no other trigger. And on that basis... I thought the district court in this case had suggested that there are other California regulations that are actually the ones that are controlling this, or other Federal regulations. I believe, Your Honor, the district court concluded that because California is not compelled under the Clean Water Act to enact Section 898, that for that reason the injuries that Section 898 imposes on Barnum are not fairly traceable to EPA. But the difficulty with that reasoning is it confuses the enactment of Section 898 with its application. Barnum concedes freely that the enactment of Section 898 is not traceable to EPA, but it's also very much true that there is no injury caused by the mere enactment of Section 898. Rather, the injury is a combination of two things, the existence of 898 as a regulation and EPA's decision to list a water body, in this case Redwood Creek, as impaired under the Clean Water Act. But in terms of the actual enforcement, it's all California, isn't it? That is true. But at the same time, Your Honor, I would direct the Court's attention, for example, to Bennett v. Speer, cited in the cases, where you had an agency different from the defendant in that action that was actually imposing the harm. That is, the Bureau of Reclamation was imposing limitations under the Endangered Species Act. That didn't stop the Court from saying that the plaintiffs in that case could still sue the Fish and Wildlife Service, a totally separate agency, because the Bureau of Reclamation was essentially a dependent actor. That agency was acting based upon what another Federal agency was doing. And there's no reason, Your Honor, we believe that that rationale should not apply here. Wasn't that, though, much more directly associated with or impacted by the Federal regulation in that opinion? You're speaking about the opinion letter? Correct. The biological opinion. Didn't the Court go out of its way to point out that they not only subjected themselves to civil liability, but that they suffered more direct consequences as a result? No. You're absolutely correct, Your Honor. But the reason why the Court highlighted that, those factors, is to show that it was substantially likely that the but-for cause of the injury was the Fish and Wildlife Service's issuance of the biological opinion. Now, here, it — there is, I believe, no question that a but-for cause of Barnum's injury is EPA's listing of Redwood Creek. Were it not for that listing, Section 898 would not apply. Neither the district court nor EPA has ever pointed to any other way that Section 898 could apply to Barnum but for EPA's listing of Redwood Creek. And as a consequence, we have — Barnum has met the substantially likely standard. It's more than substantially likely. It is a virtual certainty. I think in 13 — page 13 of their opinion, the district court, I think, takes TMDL for Redwood Creek has not yet been developed. Whatever regulatory impact Section 303D listing may ultimately occasion have yet to occur. California's forestry rules comprehensively regulate plaintiff's conduct irrespective of Redwood Creek's 303 listing. Didn't the district court come to the specific conclusion that you were going to be subject to these California regulations irrespective of the 303? Your Honor, the district court came to that conclusion with respect to other regulations. In the district court, we had argued that there were more than just Section 898 that was triggered by EPA's Redwood Creek listing. The district court said that, no, those provisions would have applied anyway because of the presence of endangered salmon species and what have you. But I do not believe the district court came to that conclusion. Endangered salmon issue is — I mean, if — if you're not listing on 303, are you still subject to — to that requirement? We are, Your Honor. Barnum is subject to other — you're correct, Your Honor. Barnum is subject to other provisions of the forest practice rules regardless of 303d, but there is a distinct and separate requirement that Section 898 of the forest practice rules applies, and the application of Section 898 is not a function of the presence of endangered species. Rather, it is a function solely of the existence of a listed water body under 303d of the Clean Water Act, and as a consequence, EPA's decision to list Redwood Creek is, in fact, the moving cause of Barnum's injury. It bears mentioning that if, in fact, something more were required, then there would be no doctrine of indirect standing that the Supreme Court has already mentioned, that the length of the causal chain is not really what is at issue. Rather, the question is whether each link in the causal chain is substantially likely. And again, there has been no contention, either from the district court or EPA, that should — that should a water body be listed, California would not apply Section 898. Now, counsel, you have alleged an independent ground, I think, for standing, which is the devaluation of the land. That is — that is correct, Your Honor. And on that point again, we would emphasize that in the record, the only evidence on the question of economic loss are two declarations from certified foresters with over half-century experience saying that Barnum's timber lands are now — How much land do they have on the — on the borders on Redwood Creek? Your Honor, I don't believe — that's not in the record, and I don't have that figure off. Are we talking hundreds of acres, thousands of acres? I think hundreds of acres would be — would be certainly fair to say, but I do not know offhand, although I would say or would mention, Your Honor, that it is, of course, true that standing for Article III purposes can be established even by, you know, as you say, a mere peppercorn. And so there is no question that there are lands that Barnum has that are directly affected. Are they attempting to sell these lands? I mean, are these lands for sale? I do not believe they are currently for sale. I know that there have not been any timber harvests for some time on Barnum's property, in part because the cost of harvesting this timber due to various economic — or due to various regulations makes the timber harvesting less than economic. I think you want to save a little time for rebuttal? Yes, Your Honor. Thank you very much. Good morning, Your Honors. My name is Andrew Mergen from the Justice Department here on behalf of EPA. I want to very quickly turn to a couple of the issues raised by the panel in questioning my opponent. First off, the evidence is very clear that the harm here stems from the California forestry rules. The California — Why can't we rely on economic harm? All we're trying to do is get standing under Section 702 of the APA. It's not a terribly demanding standard. Yes, Your Honor. The allegations of economic harm are far too speculative to support standing in this case. They are — I would submit that they are — the declarations themselves are, in fact, internally inconsistent in terms of the source and amount of economic harm. I mean, they're pretty upfront about saying that there's real and concrete economic harm, but then they, in a very forthright manner, acknowledge that they can't actually pinpoint the amount of economic harm related to the — Counsel, let's suppose that I had a house adjoining an empty lot and that my — that the owner of the lot is seeking to have it rezoned from residential to commercial, and then he intends to sell it to Walmart to construct a big store right next to my house. The zoning board makes that — makes a decision to rezone it. I don't have a legal harm within the meaning of Section 702, but I surely am an aggrieved or affected party by that agency action. We would surely agree that I would have standing to protest the zoning board's decision. Well, again, I think that all of these sorts of claims are ultimately contextual, and that's what the case law that we have cited rely on. I mean, the fact of the matter — and I think this was brought up by Judge Gwynne in his questions — this is a highly regulated area. This stream flows through Redwood National Park. It is the home of species that are listed on the Federal Endangered Species Act and on the state — Counsel, is there any question here that if EPA had taken the 303 list supplied by California and taken Redwood Creek off the list, that we would have all kinds of groups that don't own any property in this area that would have standing to protest that action? Well, certainly, Your Honor, you're correct that there are cases where environmental groups have challenged 303D lists for one reason or another. And they had no difficulty establishing standing in those cases. So they can — if the creek gets left off the list, then we have environmental groups that can bring a challenge to that. If Redwood Creek gets included, the landowners can't challenge it. But I'm missing something in the symmetry there. Well, I don't think that the asymmetry here is troublesome. First off, I think that there are many things that — the general rule, right, and many, many environmental litigants get tossed out on standing grounds because their declarations are insufficient. They fail in specificity. They fail in particularity. And that is equally true in this case. But what would they have had to have said? Well, I guess for one thing that I would submit, Your Honor, if you look at the Pronsolino case, right, which is a challenge by industry to the TMDLs developed under the Clean Water Act, you see — the standing was not an issue in that case. But you see far more discussion of a particular harm. They put a dollar figure on what they think that the TMDL is going to cost. Okay. So — but standing wasn't an issue. It's clear they could have done more. But they've got a couple of experts who have come in and said, when we have property that adjoins the creek and the creek gets put on the 303 list, it affects their property values. That doesn't seem to me to be such a stretch. No, but their own declarants, Your Honor, are unable to quantify that in any way. And let me — let me give you one example. If you took — turn to the Herman declaration and their supplemental excerpts of record at page 30, I'm looking at paragraph 8. And this is where Mr. Herman attests that the mere listing — because of the mere listing, has suffered economic injury. Because the listing triggers the application of more restrictive timber harvesting regulations. And then he cites, at the end of that paragraph, not just 898 — not just the provision 898 that they say causes them particular harm, but also 916A, during and following timber operations, the beneficial functions of riparian zones shall be restored where they are impaired. That condition exists whether or not this stream is on the 303D list. Absolutely, it exists. Because as plaintiffs very forthrightly acknowledge in their brief — and I'm opening brief page 4 — the California Department of Forestry and the state of California have imposed considerable restrictions on timber harvesting in this environment, where you have listed fish, species, and that can hardly be surprising. So this Court — I mean, Your Honor, I take Your Honor's concern about asymmetry here, but I would submit that the case law is very clear that plaintiffs have to go forward in a particular and specific way. But Pronsolino isn't going to help you because it wasn't a standing case. What standing case do you have that will tell us that the economic harm is not sufficient? Well, we looked and we cited to the common cause case the decision by Judge Bazelon, which I think is — There are two different problems. One is whether you can't ever establish economic harm, and the other is whether they fail to establish it. Now, when you get to that San Diego County gun case — Yes, Your Honor. — you're relying on the broader proposition that you can never establish economic harm. Right. Suppose the affidavit submitted here said, this property is worth $320,000.33 less. Then would it be all right? Yeah. I mean, I want to be clear. I think — Which is your problem? That it's not specific enough or that you couldn't ever do it? Well, you know, we principally relied on that they couldn't ever do it in this case. Yeah. Well, that's the one that bothers me as much. But that's not to say that I don't think that there might have been a way to do this. I mean, in the Pronsolino case, what was at issue there is somewhat different. They didn't just challenge the 303D list, right? They looked at the total maximum daily load that was developed for the pollution on that stream, and they challenged that. And by doing that, you necessarily, as a litigant, develop more context. You can make this more concrete. I mean, Judge Bybee, you raised some questions that, regrettably, I don't have the answer for, which is, how many acres are we talking about? The record seems unclear to me, personally, as to whether this creek goes through their property. That goes to Judge Reinhart's second question, which is, is the problem the lack of specificity or the fact that economic harm will never satisfy the test? And you told us first that it would never satisfy the test. And now you're telling us that it also isn't sufficient. So I understand that you want to argue both things. But I'd sure like to focus on can never satisfy the test problem, because I have some real questions about that. Well, let me give you a hypothetical. OK, sure. Of course, Your Honor. Department of Housing and Urban Development publishes an ugly house list, doesn't have any legal consequences under federal law. Now, if my house shows up on the ugly house list, which real estate agents can readily access through the internet, do I have claim against the HUD under APA to challenge that as an arbitrary and capricious action? It seems like, Your Honor, respectfully, there might be another problem, which is I'm not sure that there's final agency action. Well, let's suppose they get around the final agency action problem. I'm a government lawyer. Let's assume that away. You know, again, I think that you have to the Supreme Court's very clear, and I don't think that there should be an asymmetry insofar as environmental plainness versus economic harm. In most cases, it's far easier for litigants to show economic harm than it is for environmental. Plaintiffs often want to challenge things programmatically. They have a very difficult time doing that. In your hypothetical, I don't think it would be enough to walk into court and say, my house is on the ugly house list, because maybe you live in an area where they... And then you come in with an affidavit that says it's of less value. And you prove that up. I mean, isn't that... Doesn't that point to the whole issue that you're just disregarding third parties, that the third party looking at the house or the real estate agent looking at the house is somehow going to be influenced by the inclusion on the ugly house list and going to discount what they're looking at or seeing? Right. I mean, and in this case as well, there's all kinds of various ways people are affected in purchasing timber property. And the mere inclusion on the 303 list is only one of probably scores or multiples. I would think that, you know, the potential for the National Forest Service to take the property over and pay a higher sum in purchasing it would have more importance in terms of value than a 303 deed. Or another issue might be its proximity to the National Park. That might make it difficult, too. We're talking about standing. You know, if somebody's property is really worth less because of this, why doesn't he have standing? But do the declarations make that case, Your Honor? They acknowledge... So then you're back to the specific rather than the general proposition. Bradley was expressing concern that I have about the general proposition that no matter how specific you are, if these two experts had come in and said, as I said to you earlier, it's now worth $125,000.35, less than it was before this happened. If that happened, you would still have a problem, apparently. Well, Your Honor, we cited to the San Diego case. And the San Diego case supports our position here, right? It says that when you're talking about harm to this kind of economic value in a very, very regulated environment, I mean, this court found no standing, no economic standing. That was by the potential purchaser of the gun, not by the owner of the gun. It wasn't an APA case, either. There's no Section 702 problem there. It was a challenge to Title 18. It was a criminal enforcement statute. We distinguished the case up one side and down the other in a subsequent case called National Audubon Society v. Davis, the 2002 case. And we said economic standing for the trappers was no problem in that case. Your Honor, then I would go back to my submission that the declarations here fall short. Because if you ask yourself how you would have brought this case as litigant, these are not the declarations that you would have filed. Because, and frankly, and that's why declarations are so important in the 12b1 standing context, right? This is the only area of jurisdiction that I'm familiar of where the court actually looks at what people have to say under penalty of perjury about how they're affected by a scheme. And these declarations are not from the landowners, right? They're from foresters who attest to what they think the effect will be. And what they are— If the landowners came in, you'd say, well, how do they know? They're not experts. They don't know what the value of the property is. No, but Your Honor— Somebody's got to know. But if my house is on the ugly house list, presumably I have a direct experience of how that list may have— Oh, no. I'm going to bring a real estate agent in who says I have trouble listing houses in this neighborhood when they show up on the ugly house list. It's the first thing people ask me, is the house on the ugly house list? But in these declarations, they are unable to parse this out in any meaningful way. And in fact, Herman, which is the more specific of the two, refers to a section of the California Department of Forestry rules as affecting this analysis, and they have dropped their challenge to 916A because the district court rightly said this has nothing to do with the Clean Water Act. So it seems to me that the notion that these declarations are sufficient to demonstrate— But the value of property is always affected by lots of things. You know, it's made up of what's the location, what's the house like, what's happened to the market. Is it like Las Vegas, where the value of the property has dropped by 50 percent thanks to whatever the cause of this drop in the housing market is? But the fact that the value of property is affected by five or six things doesn't mean one thing can't cause a diminution in the value of the property. In this particular case, Your Honor, Judge Alsup said to these plaintiffs, you have come into court the first time and you haven't cited anything that ties this back to the Clean Water Act. He gave them an opportunity to amend their pleadings to tie it back to their Clean Water Act, and they came back with the Forestry Rule 898. But that rule, as their own declaration sets forth, is inextricably linked to the overall pattern of California regulation of forestry. And all of this says—what all of this says is that Judge Alsup was correct in determining that their harm relates to CDF. Counsel, you're not—the EPA is not contesting here that their approval of the 303 list was not final agency action. No, that's right, Your Honor. We have not raised that argument here. We are not making that argument. I know I've run over time. I thank you for your indulgence. Do you want to say something about the other issue that Judge Wynn was inquiring into, whether it's the— We think that Judge Alsup got that issue exactly correct, that the harm flows from the California regulation, and it's not fairly traceable to EPA. And Judge Wynn's line of questioning went to whether California had independent authority to do this, and it absolutely does. And that's what 916A, which their own declarants talk about, makes plain. There's nothing that was triggered by the adoption of this federal action? If you look at the California Department of Forestry rules, and again, they're discussed in a helpful way in Plaintiff's opening brief at page 4. California has instituted a management regime for streams and creeks and rivers with an is a part of that overall scheme. So the harm here is—it relates to California's actions and not EPA's. And I think maybe—it may be worth a second—to spend a second on Bennett v. Speer, because in that case, which plaintiffs have relied on, the court said—the Supreme Court said when you're looking at actions of third parties, you look at whether their actions are determinative or coercive. And in that case, Justice Scalia had no problem determining that the government's position was entirely coercive and determinative. I mean, the government really—the Fish and Wildlife Service caused the harm, because Bureau of Reclamation faced no choice at all. It's either go along with the buy-off or be liable under Section 9, criminal and civilly, for take of endangered species. And so in that regard, the court had no trouble saying this is coercion and there is standing, notwithstanding the actions of the third party. And the court indicated that going back to cases like Allen v. Wright and Worth v. Selden, that that's really the test. Can you say that the government controls what the third party does through either determination or coercion, and that's not present here? Thank you. Thank you very much. Thank you, counsel. All right. We'll give you a few minutes for rebuttal. Thank you, Your Honor. With respect to the question of economic injury and what the declarations say, the declarations are clear that there is an economic injury that is attributable to EPA's action in this case. But is it measurable? They do say it is measurable, but the precise amount, the dollar figure, the declarations do say they cannot come up with that, at least not at this time. But EPA is essentially asking Barnum to do what it need not do in the Article III context. EPA or Barnum is not asking for damages in this action. It's not part of Barnum's causability. Do you think it's enough to say it's of lesser value, but we don't know how much? Yes, Your Honor. Suppose that were the ultimate, when you say they can't do it at this time. Suppose at the end they said, well, we know it's been damaged, but we don't know how much. Then is that enough for non-economic recovery? Yes, Your Honor, because what that is tantamount to saying is that Barnum has suffered at least a trifle of an injury. And the case law is clear that for Article III purposes, a trifle is sufficient. Again, this is not an action for damages. It's an action for declaratory and injunctive relief under the APA. As a consequence, EPA is asking Barnum to do that which it need not do. And with respect, again, to the question of what Judge Beide mentioned on the question of symmetry, Barnum brought this action, as the record shows, originally in State Water Resources Control Board, saying the State, you State, have acted improperly by proposing 303D listing for Redwood Creek. After four years of a Board of Briefing in the California Superior Court, Barnum was told, no, you have to leave State court and go to Federal court, because what you're really doing is challenging the 303D listing. And you can only do that with the State judge. I'm sorry, Your Honor? Who said that? Well, that was a Superior Court judge in the county of Sacramento. But we can't be responsible for that. No, Your Honor. That is certainly true. But in terms of the greater equities, Barnum is essentially being bounced back and forth between the State and Federal courts, told you must sue here, you must sue there. All the time, Barnum is suffering economic injury. All at once is simply judicial review whether, in fact, EPA has violated the law by to bring that claim in Federal court. Thank you. Thank you, Your Honors.
judges: Gwin, Reinhardt, Bybee